UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
CENTER FOR POPULAR DEMOCRACY,

                          Case No. 1:16-cv-05829-NGG-SMG

          Plaintiff,

   v.

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

          Defendant.
-------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
## IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Stephen P. Berzon
  sberzon@altber.com
Eric P. Brown
  ebrown@altber.com
Connie K. Chan
  cchan@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064

*Counsel for Plaintiff Center for Popular
Democracy*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I. The Federal Reserve's Governance System and Lack of Diversity ...................................... 2

        A. Overview of the Federal Reserve System ........................................................... 2

        B. The Federal Reserve's Failure to Represent Its Diverse Constituencies ....................... 4

        C. Lack of Transparency in the Federal Reserve's Appointment Process ......................... 5

    II. Plaintiff's FOIA Request ............................................................................................... 6

    III. This Litigation and the Board's Response to the FOIA Request ....................................... 7

        A. The Board's Failure to Timely Respond to the FOIA Request .................................. 7

        B. The Board's Post-Complaint Production of Records ............................................. 7

        C. The Board's Search Affidavits ..................................................................... 8

LEGAL STANDARD ......................................................................................................... 8

ARGUMENT ..................................................................................................................... 9

    I. The Board's Search Was Inadequate Because It Failed to Pursue Clear and Certain Leads to Responsive Documents .................................................................................. 9

    II. The Board's Limited Search of the Office of Board Members Was Inadequate. ............. 15

        A. The Board Was Required to Search the Records of All Board Members .................. 16

        B. The Agency's Electronic Searches Used Inadequate Search Terms. ..................... 19

    III. The Board's Failure to Search Agency Records at the Federal Reserve Banks Was Unreasonable .............................................................................................................. 22

CONCLUSION .................................................................................................................. 25

i

# TABLE OF AUTHORITIES

## Federal Court Cases

*Amnesty International USA v. C.I.A.*,
 728 F.Supp.2d 479 (S.D.N.Y. 2010) .................................................................. 10

*Ball v. Board of Governors of Federal Reserve System*,
 87 F.Supp.3d 33 (D.D.C. 2015) ......................................................................... 23

*Banks v. United States Department of Justice*,
 700 F.Supp.2d 9 (D.D.C. 2010) ......................................................................... 15

*Bloomberg L.P. v. Board of Governors of Federal Reserve System*,
 649 F.Supp.2d 262 (S.D.N.Y. 2009), *aff'd*, 601 F.3d 143 (2d Cir. 2010) .............................. 23

*Campbell v. United States Department of Justice*,
 164 F.3d 20 (D.C. Cir. 1998) ....................................................................... 10, 14

*Carney v. United States Department of Justice*,
 19 F.3d 807 (2d Cir. 1994) ......................................................................... 2, 8, 9

*Eberg v. United States Department of Defense*,
 193 F.Supp.3d 95 (D. Conn. 2016) ..................................................................... 21

*Fox News Network, LLC v. Board of Governors*,
 601 F.3d 158 (2d Cir. 2010) ........................................................................... 22

*Fox News Network, LLC v. United States Department of the Treasury*,
 678 F.Supp.2d 162 (S.D.N.Y. 2009) .................................................................... 21

*Grand Central Partnership, Inc. v. Cuomo*,
 166 F.3d 473 (2d Cir. 1999) ............................................................................. 8

*Habeas Corpus Resource Center v. United States Department of Justice*,
 No. 08 Civ. 2649, 2008 WL 5111224 (N.D. Cal. Dec. 2, 2008) ............................................ 21

*Hall v. Central Intelligence Agency*,
 881 F.Supp.2d 38 (D.D.C. 2012) ....................................................................... 14

*Halpern v. F.B.I.*,
 181 F.3d 279 (2d Cir. 1999) .......................................................................... 9, 10

*Hasbrouck v. United States Customs & Border Protection*,
  No. 10 Civ. 3793, 2012 WL 177563 (N.D. Cal. Jan. 23, 2012)............................................. 21

*Immigrant Defense Project v. United States Immigration & Customs Enforcement*,
  208 F.Supp.3d 520 (S.D.N.Y. 2016) ....................................................................... *passim*

*Kowalczyk v. Department of Justice*,
  73 F.3d 386 (D.C. Cir. 1996) ............................................................................ 10

*Morley v. C.I.A.*,
  508 F.3d 1108 (D.C. Cir. 2007) ........................................................................... 9

*Nation Magazine, Wash. Bureau v. United States Customs Service*,
  71 F.3d 885 (D.C. Cir. 1995) ............................................................................ 17

*National Day Laborer Organizing Network v. United States Immigration & Customs
  Enforcement Agency*,
  877 F.Supp.2d 87 (S.D.N.Y. 2012) ...................................................................... *passim*

*National Immigration Project of the National Lawyers Guild v. United States
  Department of Homeland Security*,
  No. 11 Civ. 3235(JSR), 2012 WL 6809301 (S.D.N.Y. Dec. 27, 2012) .................................... 21

*Neighborhood Assistance Corp. of Am. v. United States Department of Housing &
  Urban Development*,
  19 F.Supp.3d 1 (D.D.C. 2013) ....................................................................... 15, 19

*Oglesby v. United States Department of Army*,
  920 F.2d 57 (D.C. Cir. 1990) ........................................................................... 15

*Republican National Cmte. v. Department of State*,
  235 F.Supp.3d 235 (D.D.C. 2016) ............................................................. 10, 14, 19, 25

*Schwartz v. Department of Defense*,
  No. 15CV7077ARRRLM, 2017 WL 78482 (E.D.N.Y. Jan. 6, 2017) .................................... 20, 21

*The Few, the Proud, the Forgotten v. United States Department of Veterans Affairs*,
  254 F.Supp.3d 341 (D. Conn. 2017) .................................................................. 19, 21

*United States Department of Justice v. Tax Analysts*,
  492 U.S. 136 (1989) ..................................................................................... 22

*Valencia-Lucena v. United States Coast Guard,*
  180 F.3d 321 (D.C. Cir. 1999) ........................................................................ 9, 10

*Vietnam Veterans of America Connecticut Greater Hartford Chapter 120 v. Department of Homeland Security,*
  8 F.Supp.3d 188 (D. Conn. 2014) ......................................................................... 21

*Weisberg v. United States Department of Justice,*
  705 F.2d 1344 (D.C. Cir. 1983) ............................................................................. 9

*Whitaker v. Central Intelligence Agency,*
  31 F.Supp.3d 23 (D.D.C. 2014) ............................................................................ 14

**Federal Statutory Authorities**

5 U.S.C. §552(a)(4)(B) ........................................................................................ 22
12 U.S.C. §263 ....................................................................................................... 3
12 U.S.C. §302 ................................................................................................... 3, 4
12 U.S.C. §304 ....................................................................................................... 4
12 U.S.C. §341 (Fifth) ................................................................................ 3, 18, 24
Federal Reserve Act, Pub. L. 95-188, tit. II, §202, 91 Stat. 1387 (Nov. 16, 1977) ...... 4

**Federal Rules and Regulations**

12 C.F.R. §261.2(i)(1) ................................................................................. 23, 24, 25
12 C.F.R. §261.3(a) ............................................................................................... 22

## INTRODUCTION

Plaintiff Center for Popular Democracy ("Plaintiff" or "CPD") filed a Freedom of Information Act (FOIA) request with the Board of Governors of the Federal Reserve System ("Board of Governors" or "Board) for information related to the selection and appointment of the presidents and directors of the Federal Reserve System's twelve Federal Reserve Banks ("Reserve Banks" or "FRBs").  The presidents of the twelve FRBs, who sit on the Board's Federal Open Market Committee ("FOMC"), are among the most powerful and influential actors shaping national monetary policy, yet the process by which they are chosen has long been shielded from public view.  For example, in 2015, the Board filled three mid-term vacancies with seemingly no public consultation, resulting in the appointment of three individuals all with strong ties to Goldman Sachs.  In 2016, the Board approved the reappointment of all ten incumbent FRB presidents, upon the recommendation of each FRB's board of directors, again with no public consultation and very limited transparency into the reappointment process.

CPD filed a FOIA request seeking all records relating to the process for selecting these monetary policymakers because the public has a substantial and legitimate interest in understanding what steps, if any, the Board takes to ensure that FRB leaders reflect and represent the racial, gender, and viewpoint diversity of the communities they serve, and that they remain free of conflicts of interest.  Indeed, the Board has a statutory obligation to ensure that FRB leaders represent the interests of the public, including specified constituencies that have historically been neglected (e.g., services, labor, and consumers), and, as described below, the Board has consistently failed to fulfill this congressional mandate.

The Board ignored the statutory deadlines for responding to CPD's request, and only after CPD filed this suit did the Board finally produce approximately 605 pages of responsive documents between November 2016 and March 2017.  Even then, however, the documents

1

produced by the Board, as well as the Board's declarations, establish beyond dispute that the Board's search was inadequate in at least four respects: the Board (1) failed to pursue clear leads, appearing on the face of responsive documents, identifying additional responsive documents specifically requested by CPD; (2) improperly narrowed the scope of Plaintiff's request in conducting only limited email searches of only three members of the Board and refusing to search the records of other relevant custodians, despite CPD's explicit request for responsive records of *all* Board members; (3) used unreasonably narrow search terms, ignoring obvious keywords from CPD's request; and (4) failed to search *any* agency records held at the twelve Reserve Banks.  For all these reasons, the Board's search for responsive documents fell far short of its FOIA obligations, and Plaintiff is entitled to summary judgment as a matter of law.

Because an agency cannot be granted summary judgment in a FOIA case unless it proves *both* "that its search was adequate and that any withheld documents fall within an exemption to the FOIA," *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994), the Board's motion for summary judgment must be denied.[1]  Summary judgment should instead be granted for CPD, and the Board should be ordered to conduct additional searches, as described herein, and to produce all responsive documents forthwith.

## BACKGROUND

### I.     The Federal Reserve's Governance System and Lack of Diversity

#### A.  Overview of the Federal Reserve System

The Federal Reserve System is the central bank of the United States.  The System is comprised of the Board of Governors, located in Washington, D.C.; and twelve regional Federal Reserve Banks ("Reserve Banks" or "FRBs"), located in Boston, New York, Philadelphia,

---

[1] Plaintiff does not agree that Exemptions 5 or 6 apply to any of the documents or portions of documents the Board has identified in its *Vaughn* Index, but for purposes of this litigation only, Plaintiff is not contesting the withholding of those documents.

Cleveland, Richmond, Atlanta, Chicago, St. Louis, Minneapolis, Kansas City, Dallas, and San Francisco. *The Federal Reserve System: Purposes and Functions* 4 (10th ed. Oct. 2016). A third component of the Federal Reserve System is the Federal Open Market Committee ("FOMC"), which is legally charged with overseeing open market operations, the principal tool the Federal Reserve uses to influence national monetary and credit conditions. The FOMC implements monetary policy through its control over the federal funds rate. *See* 12 U.S.C. §263; *Purposes and Functions* at 16. The FOMC is composed of the members of the Board of Governors, the FRB New York president, and four of the other FRB presidents, who serve on a rotating basis. Only FOMC members vote on policy decisions, but all FRB presidents participate in FOMC discussions and contribute to the FOMC's assessment of the nation's economy and development of policy. *Purposes and Functions* at 16.

Each FRB has a president and a nine-member board of directors. 12 U.S.C. §302. Unlike the seven members of the Board, who are appointed by the President of the United States and confirmed by the U.S. Senate, each FRB president is appointed by the FRB's board of directors, subject only to the Board's approval. FRB presidents serve for a term of five years, subject to mandatory retirement at age 65, and are eligible for reappointment. 12 U.S.C. §341 (Fifth); *Purposes and Functions* at 10.

Each FRB's board of directors is comprised of three classes of directors: Class A, Class B, and Class C. By statute, the Class B and Class C directors are to represent the interests of the public, "with due but not exclusive consideration to the interests of agriculture, commerce, industry, services, labor, and consumers," and only the Class A directors are to represent the interests of the stockholding member banks in the District. 12 U.S.C. §302. Both Class A *and* Class B directors, however, are elected by the stockholding member banks in the District, and

only Class C directors are appointed by the Board.  12 U.S.C. §§302, 304.  In the past thirty

years, the Board has appointed at least twelve former Class B directors to Class C seats.

Declaration of Shawn Sebastian ("Sebastian Decl.") ¶12 & Ex.1.

### B.  The Federal Reserve's Failure to Represent Its Diverse Constituencies

Throughout its 105-year history, the Federal Reserve has overwhelmingly been run by

white, male, corporate and financial executives.  Sebastian Decl. ¶¶4, 8-16 & Exs. 1-3.  A 1976

U.S. House of Representatives' Banking Committee report found: "Women are ignored totally in

the selection of district bank directors … the Fed has never had a woman among the 1,042

directors in its 62-year history….Minorities are given little more than token representation."  In

response to concerns that the nation's monetary policies were being made by decision-makers

who failed to reflect the diverse interests of the American public, Congress amended the Federal

Reserve Act the following year to expressly require that the Federal Reserve "represent the

public, without discrimination on the basis of race, creed, color, sex, or national origin, and with

due but not exclusive consideration of the interests of agriculture, commerce, industry, services,

labor, and consumers."  Pub. L. 95-188, tit. II, §202, 91 Stat. 1387 (Nov. 16, 1977) (codified as

amended at 12 U.S.C. §302); Sebastian Decl. ¶5 & Ex. 1.

Notwithstanding the 1977 amendment, in 1992, a new study on diversity at the Federal

Reserve by the U.S. House Banking Committee again found "a decided lack of minorities and

women," and that the Federal Reserve "simply ignored those parts of the law which require

consumer and labor representatives on the Federal Reserve Boards [of directors]."  Sebastian

Decl. ¶6 & Ex. 1.  In 2010, a Government Accountability Office study of diversity at the Federal

Reserve, commissioned by Congress as part of the Dodd-Frank Act, once again found that

"diversity of Reserve Bank boards was limited from 2006 to 2010" and that "labor and consumer

4

groups had less representation than other industries." *Id.* ¶7 & Ex. 1; *see id.* ¶¶8-11.  In the

Federal Reserve's 105-year history, there had never been a Black or Latino FRB president, until

Raphael Bostic was appointed president of FRB Atlanta, effective June 2017.  *Id.* ¶8 & Ex. 1.

### C.  Lack of Transparency in the Federal Reserve's Appointment Processes

Despite the importance of the selection of FRB presidents and board directors, the

process for choosing these key policymakers is largely hidden from public view.  For example,

in 2015, the Board filled three mid-term presidential vacancies (Patrick Harker as president of

FRB Philadelphia, Robert Kaplan as president of FRB Dallas, and Neel Kashkari as president of

FRB Minneapolis) with no public consultation and very limited transparency in the process.

Sebastian Decl. ¶¶16-18.  The lack of transparency is particularly troubling to CPD given that

Patrick Harker led the very search committee tasked with choosing the next president of the FRB

Philadelphia, Robert Kaplan was on the board of the third-party search firm Heidrich &

Struggles retained to find presidential candidates for the FRB Dallas, and all three appointees

have strong ties to Goldman Sachs – all of which calls into serious question whether the Board is

fulfilling its statutory mandate to ensure that the Federal Reserve represents the interests of

"services, labors, and consumers."  *Id.* ¶19 & Ex. 4; *see* 12 U.S.C. §302.

In February 2016, the Board approved the reappointment of all ten incumbent FRB

presidents whose terms were ending:  Eric S. Rosengren (FRB Boston); William C. Dudley

(FRB New York); Patrick T. Harker (FRB Philadelphia); Loretta J. Mester (FRB Cleveland);

Jeffrey M. Lacker (FRB Richmond); Dennis P. Lockhart (FRB Atlanta); Charles L. Evans (FRB

Chicago); James B. Bullard (FRB St. Louis); Esther L. George (FRB Kansas City); and John C.

Williams (FRB San Francisco).[2]  *Id.* ¶20.  Again, despite the importance of these reappointments

---

[2] President Kaplan (FRB Dallas) and President Kashkari (FRB Minneapolis) were approved for terms to
February 28, 2021 at the time of their initial appointments in late 2015.

– and despite the fact that CPD's Fed Up campaign had by that point already been advocating for over a year for the Federal Reserve to adopt transparency and process reforms for the presidential selections – there appears to have been no public consultation and extremely limited transparency in the process.  *Id.* ¶21.  Little or no information was shared with the public about the metrics and criteria used to evaluate the performance of incumbent presidents, whether outside candidates were considered, and if so, their identities.  *Id.* ¶22.  The lack of public consultation and transparency is particularly troubling to CPD given that of the twelve then-current FRB presidents, only two were women, and all but one were white.  *Id.* ¶¶9, 22.

## II.     Plaintiff's FOIA Request

Plaintiff CPD is a non-profit organization that works to promote economic and racial justice and to strengthen the role of workers and immigrants in building a participatory democracy.  *Id.* ¶2.  CPD organizes and directs the national "Fed Up" campaign, whose mission is to make the Federal Reserve more representative of and responsive to the public and to encourage the Federal Reserve to adopt pro-worker economic policies.  *Id.* ¶¶1-3.  In pursuit of these goals, CPD advocates for greater diversity among the Federal Reserve's leadership and greater transparency in the Federal Reserve's governance.  *Id.* ¶3.

On August 5, 2016, CPD submitted a FOIA request to the Board seeking information about the reappointment of ten FRB presidents in 2016, as well as information about the Board's policies and procedures for appointing FRB leaders generally.  *See* Plaintiff's Rule 56.1 Statement of Undisputed Material Facts ("PSUF") ¶¶1-2; FOIA Request.[3]  Plaintiff's Request sought several categories of documents, the following five of which are at issue in this action: (a) records relating to the Board's reappointment of ten FRB presidents in February 2016 (Part II);

---

[3] Citations to "FOIA Request" refer to Exhibit A to the Declaration of David G. Caperton, which is attached as Exhibit 1 to the Declaration of Edwin R. Cortes ("Cortes Decl.").

(b) records relating to the Board's policies, procedures, guidelines, and practices regarding nomination, appointment, review, and reappointment of FRB presidents (Part III); (c) records relating to the Board's oversight of the nomination and election of Class A and Class B directors of the FRBs (Part IV); (d) records relating to the Board's appointment of Class C directors of the FRBs (Part V); and (e) records relating to the Board's policies and practices regarding promoting diversity among the Federal Reserve's leadership (Part VI).  PSUF ¶2.

### III.    This Litigation and the Board's Response to the FOIA Request

#### A.  The Board's Failure to Timely Respond to the FOIA Request

After receiving CPD's FOIA Request, the Board extended its time to respond by the statutory maximum of 10 additional business days, to September 19, 2016, but then failed to provide a response by that date.  PSUF ¶¶4-9.  On October 19, 2016, having heard nothing further from the Board, CPD filed suit to compel production of the requested records.  *Id.* ¶9.

#### B.  The Board's Post-Complaint Production of Records

After litigation commenced, the Board finally began producing responsive records. PSUF ¶10; Pl.'s Response to Defendant's Rule 56.1 Statement of Undisputed Material Facts ("PRDSUF") ¶33.  The Board provided three interim responses, in November 2016, December 2016, and February 2017, and provided its final response on March 10, 2017.  PSUF ¶¶10-11; PRDSUF ¶¶27-28.  In its March 10, 2017 final response, the Board also sought clarification of Part VI, subparts 5, 6, 7, and 8 of the FOIA Request.  PSUF ¶11; PRDSUF ¶30.  Plaintiff provided the requested clarification on April 7, 2017.  PSUF ¶12; PRDSUF ¶31.  The Board did not produce any documents or provide any other substantive response to CPD's April 7, 2017 letter until February 8, 2018, the day before this brief was due.  PSUF ¶13.[4]

---

[4] The Board waited until the day before Plaintiff's summary judgment motion was due to produce an additional 562 pages of heavily redacted documents.  *See* PSUF ¶¶13-15.  The February 8, 2018 production consists

## C.  The Board's Search Affidavits

As a result of the parties' meet and confer process, the Board agreed to produce a *Vaughn*

Index and an adequacy of search declaration.  PSUF ¶18.  After reviewing the Declaration of

David Caperton ("Caperton Decl."), CPD informed the Board of various ways in which the

Board's search was inadequate.  *Id.* ¶20.[5]  The Board agreed to provide a supplemental

declaration and subsequently produced the Supplemental Declaration of David G. Caperton

("Supp. Caperton Decl."), in which the Board agreed to supplement its response to Part III,

subpart 10.  PSUF ¶¶14, 21-22; Supp. Caperton Decl. ¶27.[6]  Plaintiff again informed the Board

of persistent deficiencies in the Board's search, including its failure to search for additional

responsive records identified in documents already produced, and its failure to use certain

obvious keyword search terms in searching all relevant custodians' electronic records.  *Id.* ¶23.

## LEGAL STANDARD

FOIA was enacted "to promote honest and open government and to assure the existence

of an informed citizenry to hold the governors accountable to the governed."  *Grand Cent.*

*P'Ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (internal quotation marks and citation

omitted).  To satisfy its FOIA obligations, the agency must meet its burden of showing both "that

its search was adequate and that any withheld documents fall within an exemption to the FOIA."

*Carney*, 19 F.3d at 812.

---

exclusively of documents responsive to Part VI, subparts 5 through 8, and Part III, subpart 10 of the FOIA Request, and does not in any way address or rectify the deficiencies in the Board's search described herein that are the subject of this motion.  *Id.* ¶16.  Given that Defendant waited until the last day before Plaintiff's summary judgment motion was due to produce these responsive documents – notwithstanding that CPD provided the requested clarification concerning Part VI, subparts 5 through 8 nearly one year ago (PSUF ¶12; PRDSUF ¶32); and the Board promised to produce the documents responsive to Part III, subpart 10 more than six months ago (PSUF ¶14; Supp. Caperton Decl. ¶27) – Plaintiff has not yet had an opportunity to review the new production in full.  PSUF ¶17.  Plaintiff expressly reserves the right to contest at a later time the adequacy of the Board's search and its withholding of documents and portions of documents in connection with its February 8, 2018 production.

[5] Citations to "Caperton Decl." refer to Exhibit 1 to the Cortes Declaration.

[6] Citations to "Supp. Caperton Decl." refer to Exhibit 2 to the Cortes Declaration.

To prevail on summary judgment under FOIA, an agency must "show beyond material doubt … that it has conducted a search reasonably calculated to uncover *all* relevant documents." *Morley v. C.I.A.*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)) (emphasis added); *Nat'l Day Laborer Organizing Network v. U.S. Immigration & Customs Enforcement Agency*, 877 F.Supp.2d 87, 95 (S.D.N.Y. 2012) ("*NDLON*").  Summary judgment cannot be granted for the agency "where the agency's response raises serious doubts as to the completeness of the agency's search, where the agency's response is patently incomplete, or where the agency's response is for some other reason unsatisfactory." *NDLON*, 877 F.Supp.2d at 96 (citation omitted).  In addition, "plaintiffs may defeat summary judgment if they can show 'some tangible evidence' that defendants have not satisfied their burden." *Id.* (quoting *Carney*, 19 F.3d at 812).  "[I]f a review of the record raises substantial doubt, particularly in view of well defined requests and positive indications of overlooked materials," summary judgment may not be granted in favor of the agency and should instead be granted for the plaintiff.  *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999) (internal quotation marks and citation omitted).

## ARGUMENT

Though an agency's search need not be perfect in every respect, FOIA "requires that agencies conduct a search 'reasonably calculated to uncover *all* relevant documents,' not 'most' relevant documents." *NDLON*, 877 F.Supp.2d at 102 (quoting *Morley*, 508 F.3d at 1114).  Here, the Board failed to conduct an adequate search for all responsive records, entitling Plaintiff to summary judgment based on the Board's: (1) failure to pursue "'clear and certain' lead[s]" regarding the existence of additional responsive documents related to the annual assessment of the Reserve Bank presidents, *Halpern v. F.B.I.*, 181 F.3d 279, 288 (2d Cir. 1999) (quoting

9

*Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996)); (2) failure to search all

locations and custodians reasonably likely to contain responsive documents, including the files

of all Board members; (3) failure to use reasonable search terms in searching for responsive

electronic documents; and (4) failure to search agency records at the Reserve Banks.

## I.   The Board's Search Was Inadequate Because It Failed to Pursue Clear and Certain Leads to Responsive Documents.

"Agencies are 'obliged to pursue any clear and certain lead' that may relate to the subject

of a FOIA request." *Immigrant Def. Project v. U.S. Immigration & Customs Enforcement*, 208

F.Supp.3d 520, 530 (S.D.N.Y. 2016) (quoting *Halpern*, 181 F.3d at 288-89) (quotation marks

and citation omitted); *accord Valencia-Lucena*, 180 F.3d at 325 (agencies must "follow through

on obvious leads to discover requested documents"). "[T]he court evaluates the reasonableness

of an agency's search based on what the agency knew at its conclusion rather than what the

agency speculated at its inception." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C.

Cir. 1998) (FBI's search inadequate where it failed to "revise its assessment" of what constituted

a reasonable search "to account for leads that emerge[d] during its inquiry"). Thus, "an agency

must pursue those leads 'that raise red flags pointing to the probable existence of responsive

agency records that arise during its efforts to respond to a FOIA request.'" *Immigrant Def.*

*Project*, 208 F.Supp.3d at 530 (quoting *Amnesty Int'l USA v. C.I.A.*, 728 F.Supp.2d 479, 498

(S.D.N.Y. 2010)); *see also Valencia-Lucena*, 180 F.3d at 326 (agency may not ignore "positive

indications of overlooked materials"); *Republican Nat'l Cmte. v. Dep't of State*, 235 F.Supp.3d

235, 242 (D.D.C. 2016) ("[F]urther searches are necessary when an agency is made aware of

'additionally potentially responsive materials.'") (citation omitted).

Here, several of the documents produced by the Board revealed the existence of

additional documents responsive to Plaintiffs' FOIA Request, in particular subparts (a) and (b) of

10

Part II of Plaintiff's FOIA Request, which sought "[a]ll records reflecting any assessments of [each FRB president's] performance as a Bank president conducted or commissioned by the Board, or agents thereof," and "[a]ll records reflecting any assessments of [each FRB president's] performance as a Bank president conducted or commissioned by the [relevant FRB] board of directors, or agents thereof," respectively, "at any time between December 2010 and February 2016." FOIA Request at 7. Yet the Board failed to produce those additional documents and made no effort to expand its search to find them. PSUF ¶¶36-37.

The Board maintains that it satisfied its obligation to search for and produce documents responsive to Part II, subparts (a) and (b), because the Board provided each FRB board of directors' reappointment recommendation letters, which "include assessments of Reserve Bank presidents." Supp. Caperton Decl. ¶15. But several documents indicate that the Board requires the board of directors of each FRB to evaluate the performance of its president on an *annual* basis, and to discuss that annual assessment during meetings between the members of the Committee on Federal Reserve Bank Affairs ("BAC") and the FRB's chairman and deputy chairman. For example, an excerpt from the Federal Reserve Administrative Manual states:

> Performance evaluation. … *[E]ach Reserve Bank's board of directors should evaluate its president's performance annually*, and that evaluation should be discussed during Reserve Bank evaluation meetings between the members of the Committee on Federal Reserve Bank Affairs and the Reserve Bank's chairman and deputy chairman. Reserve Banks' chairmen should inform their respective presidents of these annual assessments, and in the uncommon situation when a president's performance is found to be unsatisfactory, that president should be informed well in advance that his or her five-year appointment is at risk.

PSUF ¶25; Chan Decl. Ex. 3 (CPD_FOIA 00207) (emphasis added).

Moreover, according to statements of Board policy, these annual assessments of each Reserve Bank president, including the discussions during and outcome of the annual meetings between the BAC and each Reserve Bank's chairman and deputy chairman, are integral to the

11

presidential reappointment process, the subject of Part II of Plaintiff's FOIA request, about

which CPD broadly sought *all* related records.  *See* FOIA Request at 7-20.  For example, the

Board of Governors' Frequently Asked Questions page states:

> In considering whether to reappoint, the eligible Reserve Bank directors assess
> their president's performance.  The assessment includes consideration of, for
> example, the president's ability to effectively lead the Reserve Bank, the
> president's performance in achieving the Reserve Bank's and Federal Reserve
> System's strategic objectives, and the president's ability to effectively represent
> the Federal Reserve to the public.  *The Reserve Bank directors' assessment is also*
> *informed by annual discussions between the chair and deputy chair of each*
> *Reserve Bank board and the Board of Governors' Committee on Federal Reserve*
> *Bank Affairs.*
>
> Reappointments are subject to approval by the Board of Governors, which
> reviews the Reserve Bank directors' assessment of their president's performance
> and any additional perspectives from members of the Board of Governors.

PSUF ¶26; Chan Decl. Ex. 4 (CPD_FOIA 00103) (emphasis added).  Consistent with the

foregoing, a summary of the Board's February 19, 2016 meeting, at which the Board voted to

reappoint all ten Reserve Bank presidents, explains:

> Before making these reappointments, Reserve Bank directors evaluated the
> incumbents' performance and considered the effectiveness of their leadership in
> several key areas.  The directors' reappointment decisions were also informed by
> *annual discussions* each Reserve Bank's chair and deputy chair have with the
> Board's Committee on Federal Reserve Bank Affairs regarding the performance
> of their president and FVP."

PSUF ¶27; Chan Decl. Ex. 6 (CPD_FOIA 00041) (emphasis added).

The letters from the Reserve Bank boards of directors recommending the reappointment

of their incumbent presidents confirm that consideration of the annual assessments and meetings

between the BAC and Reserve Bank chairs and deputy chairmen is an integral part of the

reappointment process.  They further reveal that the BAC typically provides written feedback or

other commentary on each FRB board of directors' annual assessment of its president.  For

example, in its December 17, 2015 letter to Governor Powell recommending the reappointment

of President Dennis Lockhart, the FRB Atlanta board of directors explains that "[t]he material and discussion" it considered in reappointing President Lockhart "included a review of the President's … performance from 2011-2015 *as well as the Bank Affairs Committee Annotated Bank Evaluations summaries from 2011-2014*."  PSUF ¶30; Cortes Decl. Ex. 3 (CPD_FOIA 00241) (emphasis added).[7]  The FRB Kansas City board of directors' December 24, 2015 letter to Governor Powell recommending the reappointment of President Esther George similarly makes reference to "the Board of Governors annotated Bank Affairs Committee reports and executive session discussions" as an example of documents considered in the reappointment process.  PSUF ¶31; Cortes Decl. Ex. 3 (CPD_FOIA 00264).[8]

These documents suggest that for each Reserve Bank president, there should exist, at a minimum: (1) an annual assessment of the president's performance conducted by the relevant Reserve Bank's board of directors; (2) a document communicating this annual assessment or a summary thereof to the BAC or other members of the Board; (3) an agenda or similar document setting forth the subject matter of the meeting between the BAC and the Reserve Bank chair and deputy chair at which the president's annual assessment is to be discussed; (4) the BAC's "Annotated Bank Evaluations summaries," or similar documents; (5) meeting minutes or similar

---

[7] The letter from FRB Atlanta also references review of "quarterly strategic progress reviews, the annual Bank evaluation by the Bank Affairs Committee, … and Dennis' annual leadership assessment by the Atlanta Board of Directors."  PSUF ¶30; Cortes Decl. Ex. 3 (CPD_FOIA 00241).

[8] The letter from FRB Kansas City also describes review of "several performance reports and measures that directors rely on *each month* to ensure that Bank operations and leadership of System responsibilities are performing at satisfactory levels."  PSUF ¶31; Cortes Decl. Ex. 3 (CPD_FOIA 00264); *see also, e.g.*, Letter from FRB Boston describing consideration of "[f]eedback from the Board of Governors [] obtained in the annual meeting with the [BAC] in which Chair Nordhaus participated for the last four years," PSUF ¶32; Cortes Decl. Ex. 3 (CPD_FOIA 00232); Letter from FRB Richmond describing consideration of "feedback from annual discussions with the [BAC] regarding the performance of the President, First Vice President, and Bank," PSUF ¶33; Cortes Decl. Ex. 3 (CPD_FOIA 00235); Letter from FRB Chicago describing consideration of "a variety of documentation and discussions encompassing the last five years of President Evans' performance," PSUF ¶34; Cortes Decl. Ex. 3 (CPD_FOIA 00249); Letter from FRB San Francisco describing review of "written performance summar[y] for President Williams," which was in turn based on "annual performance evaluations for President Williams …, the FRBSF annual Bank Evaluation," and other documents," PSUF ¶35; Cortes Decl. Ex. 3 (CPD_FOIA 00253).

documents memorializing the discussions between the BAC and the FRB chair and deputy chair

regarding the president's performance; and (6) a document communicating the results of the

meeting between the BAC and the Reserve Bank chair and deputy chair to the FRB president.

All of these documents are responsive to plaintiff's FOIA request, including but not

limited to subparts (a), (b), (g), (j), (m), and (p) of Part II.  Yet the Board neither produced any

such documents nor identified any such documents as withheld pursuant to an exemption.  PSUF

¶¶36-37.  Implausible as it is that the Board was unaware of these annual assessments at the

outset of processing CPD's request, it is impossible that the Board was unaware by the time it

unearthed the above-described documents.  *See Campbell*, 164 F.3d at 28.  This is particularly so

for the "Annotated Bank Evaluations summaries," which are repeatedly identified by name.  *See*

*Hall v. C.I.A.*, 881 F.Supp.2d 38, 61-62 (D.D.C. 2012) ("Where specific records … are

referenced in [agency] documents, it is no longer 'mere speculation' that the files exist.");

*Whitaker v. C.I.A.*, 31 F.Supp.3d 23, 44-45 (D.D.C. 2014) (in response to request for records

relating to missing airplane investigation report involving a named pilot and an unnamed co-

pilot, agency's failure to search for documents mentioning the co-pilot (identified in other

responsive documents) rendered search inadequate).  The Board's failure to pursue these clear

leads and to search for documents plainly responsive to Plaintiff's FOIA request was therefore

unreasonable and inadequate.  *See, e.g.*, *Campbell*, 164 F.3d at 28 (agency's initial assumption

that review of only one database would be necessary "became untenable once the FBI discovered

information suggesting the existence of documents that it could not locate without expanding the

scope of its search"); *Republican Nat'l Cmte.*, 235 F.Supp.3d at 241-42 (publication of report

referencing existence of potentially responsive documents "put [agency] on notice of the

potential existence of records subject to the request and [agency] was obligated to expand the

scope of its search"); *Neighborhood Assistance Corp. of Am. v. U.S. Dep't of Housing & Urban Dev.*, 19 F.Supp.3d 1, 10-11 (D.D.C. 2013) (search inadequate where agency failed to search certain e-mail accounts after other records indicated that those custodians were likely to possess responsive documents).  The Court should order the Board to conduct an additional search for these documents and to produce all responsive documents forthwith.

## II.     The Board's Limited Search of the Office of Board Members Was Inadequate.

Although one location may be the "most likely" to turn up records, "the agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested."  *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Similarly, the agency cannot satisfy its FOIA obligations simply by searching only the files of the custodians "'most likely' to have responsive records," *NDLON*, 877 F.Supp.2d at 98; rather, it must search "*all* custodians who were reasonably likely to possess responsive documents," *id.* at 96 (citing *Banks v. U.S. Dep't of Justice*, 700 F.Supp.2d 9, 15 (D.D.C. 2010)) (emphasis added); *see id.* at 97-98, 101-02 (agency unreasonably failed to search certain offices and custodians despite evidence that they were involved in discussions relevant to the request).

Here, the Board identified the "Office of Board Members" as one of the Board offices most likely to have responsive records, *see* PSUF ¶38; Caperton Decl. ¶28, yet its search of this office was unreasonably narrow in at least two respects.  First, within the Office of Board Members, the Board unreasonably searched the records of only Chair Jerome Powell, former Chair Janet Yellen, and Former Vice Chairman Donald Kohn for the period of time during which each served as Chair of the Board's Committee on Federal Reserve Bank Affairs ("BAC"), *see* PSUF ¶39; Caperton Decl. ¶¶28, 45; Supp. Caperton Decl. ¶4, despite CPD's explicit request for records in the possession or control of "*any member(s)* of the Board," *see* FOIA Request, Part

15

II(g), (h), (i), (m), (n)) (emphasis added), and despite evidence that all of the Board's members are involved in the FRB presidential reappointment process. Second, in searching the e-mails of the BAC Chairs, the Board unreasonably limited the keywords it used to locate responsive records. Each of these failures renders the Board's search inadequate.

### A. The Board Was Required to Search the Records of All Board Members.

Rather than search the files of all of the Board members who served at any time from January 1, 2010 to the present, as CPD requested, the Board searched only the e-mails of the three individuals who served as Chair of the BAC during that time period. PSUF ¶39; Caperton Decl. ¶¶28, 45.[9] Plaintiff's FOIA request, however, expressly sought all records relating to the FRB presidential selection and reappointment process in the possession of any individual member of the Board. For example, Plaintiff broadly sought, *inter alia*:

> Records of any meetings between *any member(s)* of the Board and any directors of the [FRB] relating to [FRB President], any other candidate for the position of president of the [FRB], or the presidential appointment process, including but not limited to *meeting minutes, calendar entries, reports, and notes thereof*;

> Records of any meetings between *any member(s)* of the Board and any candidate for the position of president of the [FRB], including but not limited to *meeting minutes, calendar entries, reports, and notes thereof*;

> Records of any meetings of the Board or between *any member(s)* of the Board relating to [FRB President], any other candidate for the position of president of the [FRB], or the presidential appointment process, including but not limited to *meeting minutes, calendar entries, reports, and notes thereof*;

> All materials in the possession of *any members* of the Board concerning [FRB President's] candidacy, including background materials provided to Governors in advance of their interviews of [FRB President], and any materials concerning [FRB President] received from sources other than the [FRB]; [and]

> All materials in the possession of *any members* of the Board concerning candidates other than [FRB President] for the position of president of the [FRB].

---

[9] Even the limited searches of these three Board members were inadequate due to the unreasonably narrow keywords used, as explained in Section II.B, *infra*.

PSUF ¶40; FOIA Request Part II, subparts (g), (h), (i), (m), (n) (emphases added).  Given the express nature of Plaintiff's request for records in the possession of any single member of the Board relating to the reappointment process, it was unreasonable for the Board not to search the calendars, e-mails, and other files of all Board members for responsive documents.  The Board's failure to search the records of all Board members is not only a breach of its "duty to construe a FOIA request liberally," *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995), but an unjustified refusal to honor the plain text of an explicit request.

The Board claims it was reasonable not to search the records of any other Board members because "[t]he purpose of creating a BAC … is to distribute duties among the members," and contends that "it goes against common sense to assume that all Board members would communicate with Reserve Bank boards about presidential appointments and reappointments, when those duties have specifically been delegated to the BAC."  Supp. Caperton Decl. ¶4; *see also id.* ¶¶5, 25-26.  The Board's explanation is inadequate for at least two reasons.

First, the Board improperly narrowed the scope of CPD's request by construing it as seeking only "communications" between the Board members and the FRB boards when in fact Plaintiff requested *all* records relating the reappointment of the FRB presidents.  Even assuming that the BAC is primarily responsible for the Board's official communications with the FRB boards regarding the reappointment of FRB presidents, the agency's affidavit does not justify the Board's failure to search the files of all Board members for other types of responsive records, such as communications with one another or with third parties, notes, and calendar entries.

Second, even if some functions of the FRB reappointment process are delegated to the BAC, the Board's statutory mandate and its own published policy statements indicate that *all* of the Board's members—not only the chair of the BAC—are involved in the selection and

appointment or reappointment of the Reserve Bank presidents.  The Federal Reserve Act provides that Reserve Bank presidents are appointed by a bank's board of directors, "with the approval of the Board of Governors of the Federal Reserve System."  12 U.S.C. §341 (Fifth).  The Act thus requires that each of the Board's members be involved in the appointment process.

The involvement of all Board members is confirmed by the documents already produced by the Board in response to the FOIA request.  *See, e.g.*, PSUF ¶¶26, 41-45; Chan Decl. Ex. 4 (CPD_FOIA 00103) (Board's webpage describing role of Board members in reappointment process); Cortes Decl. Ex. 4 (CPD_FOIA 00281-85) (memo from BAC Chair Powell to "Board of Governors," indicating he is "forwarding for the Board's consideration" materials related to the FRB presidential reappointments); Chan Decl. Ex. 5 (CPD_FOIA 00025-27) (email dated 2/18/16 from Bob Frierson to Janet Yellen and Jerome Powell (with others cc-ed) attaching information for the Board's 2/19/16 meeting on FRB presidential reappointments); Chan Decl. Ex. 6 (CPD_FOIA 00041-42) (summary of Board's 2/19/16 meeting, attended by then-Chair Yellen, Vice Chair Fischer, and Governors Tarullo, Powell, and Brainard, indicating that staff presented information to the Board on the reappointments); Chan Decl. Ex. 7 (CPD_FOIA 00286) (recording of 2/19/16 Board vote on reappointments).

Given the entire Board's involvement in the selection and appointment of FRB presidents—such as interviewing and evaluating candidates, reviewing annual performance assessments for reappointment candidates, and ultimately approving the appointments—the Board's restriction of its search to the files of only the BAC Chairs was unreasonable.  *See, e.g.*, *NDLON*, 877 F.Supp.2d at 98 (agency's failure to search records of chief of staff who was circulating memoranda at the time regarding the subject matter at issue was unreasonable); *id.* at 103 & n.79 (agency had duty to search records of individuals cc-ed on responsive e-mail);

*Neighborhood Assistance Corp. of Am.*, 19 F.Supp.3d at 11 (agency's failure to search e-mail of persons involved in decision subject to FOIA request rendered search inadequate); *Republican Nat'l Cmte.*, 235 F.Supp.3d at 236, 240-41 (agency's failure to search schedules or calendars in response to request for "visitor logs or other records detailing any visitors" was unreasonable and violated its "duty to construe a FOIA request liberally") (quotation marks and citation omitted).

The Board insists that "a broader search of all emails, calendars, and hardcopy files of *all* Board members … would be unlikely to uncover additional responsive information" because "the BAC is charged with" overseeing the FRB presidential reappointment process. Supp. Caperton Decl. ¶5. But it is not unreasonable to think that other Board members might have documents reflecting their own notes on and assessments of the FRB presidents, other potential candidates, and the reappointment process, in connection with their responsibility to evaluate and vote on the Reserve Bank boards' reappointment recommendations. If the Board's position is that the BAC Chair is in fact the sole Board member who undertakes any substantive role in the reappointment process and in reviewing the FRB boards' recommendations, and that the other Board members do no more than cast a perfunctory vote of approval, then the Board should so state under oath. Otherwise, the Board should be required to search the records of all Board members who held office during the relevant time period for responsive documents.

### B. The Agency's Electronic Searches Used Inadequate Search Terms.

Aside from the agency's unreasonable failure to search the e-mails, calendars, and other files of all relevant custodians, the agency's search of the BAC Chairs' e-mails was itself inadequate in its failure to use appropriate keyword searches.

"An agency's declaration about a search must reasonably explain why it selected certain search terms and rejected obvious alternatives." *The Few, the Proud, the Forgotten v. U.S. Dep't*

19

*of Veterans Affairs*, 254 F.Supp.3d 341, 356 (D. Conn. 2017).  When evaluating the search terms

used by an agency, the proper inquiry is "whether the search appears designed to return all

relevant records."  *Immigrant Def. Project*, 208 F.Supp.3d at 527.  "Though an agency is not

required to search for all possible variants of a particular name or term, it must use search terms

reasonably calculated to yield responsive records."  *Schwartz v. Dep't of Def.*, 2017 WL 78482,

at *9 (E.D.N.Y. Jan. 6, 2017) (quotation marks and citation omitted).

    Here, the only e-mail searches that the Board conducted consisted of a search of the

respective BAC Chairs' emails "using as search terms the email addresses of the individuals who

served as Reserve Bank board Chairman during [the applicable] time, along with a search using

the email addresses of the Reserve Bank board Chair's assistants."  PSUF ¶46; Caperton Decl.

¶45; *see* Supp. Caperton Decl. ¶13.[10]  But the FOIA Request broadly sought all communications

between the Board, on the one hand, and any Reserve Bank director, Reserve Bank president,

presidential candidate, or third-party search firm, on the other, among other documents.  *See*

Request Part II(p)-(r).  Neither the Caperton Declaration nor the Supplemental Caperton

Declaration explains the agency's failure to use keyword searches or to search more broadly for

the names or e-mail addresses of all relevant individuals.  PSUF ¶¶47-48.[11]

    Here, the Board failed to use several glaringly obvious terms—including the names of the

Reserve Bank presidents, the names of the Reserve Bank chairs, the names of the search firms

retained by each Reserve Bank to assist with the reappointment process, the names of any other

---

[10] The original Caperton Declaration also notes that a senior OSEC officer "searched emails and other files where he believed responsive records might be located," Caperton Decl. ¶31, but this vague and generic description falls far short of the agency's obligation to demonstrate that a reasonable search was undertaken in good faith.  The Supplemental Caperton Declaration does nothing to address these deficiencies.  *See* Supp. Caperton Decl. ¶¶20, 22.

[11] The Board attempts to justify its narrow set of search term only by asserting that the search it conducted was reasonable in response to Part II, subpart (g), which sought records of meetings between any Board members and Reserve Bank directors regarding the ten specified presidential reappointments.  Supp. Caperton Decl. ¶26; *see* Board Br. at 12 n.5.  But this ignores CPD's requests under subparts (p), (q), and (r).

candidates, as well as more generic terms such as "appointment," "reappointment," "president," and "director."  Based on the broad scope of CPD's request, which sought *all* records relating to the appointment and reappointment of Reserve Bank presidents, as well as records relating to the appointment of FRB directors, at a minimum, the Board should have used these additional terms.

Where an agency's search terms do not appear reasonably calculated to return all relevant records, courts have concluded that the agency's search was inadequate.  *See, e.g.*, *The Few, the Proud, the Forgotten*, 254 F.Supp.3d at 356 (in responding to request for records concerning the "Subject Matter Expert program," agency's failure to search for the terms "Subject Matter Expert" and "SME" was unreasonable, notwithstanding agency's use of other relevant search terms); *Eberg v. U.S. Dep't of Defense*, 193 F.Supp.3d 95, 110 (D. Conn. 2016) (administrator's search inadequate where declaration did not "explain why he narrowed his search terms to exclude keywords from Plaintiff's FOIA request"); *Vietnam Veterans of Am. Conn. Greater Hartford Chapter 120 v. Dep't of Homeland Sec.*, 8 F.Supp.3d 188, 219 (D. Conn. 2014) (declaration inadequate where it did "not provide an explanation for why he used [certain] search terms … but did not use other terms … to identify responsive documents"); *Immigrant Def. Project*, 208 F.Supp.3d at 529-30 (agency's use of plural but not singular forms of key search terms unreasonable); *Fox News Network, LLC v. U.S. Dep't of the Treasury*, 678 F.Supp.2d 162, 166 (S.D.N.Y. 2009) (failure to use an obvious acronym inadequate); *Hasbrouck v. U.S. Customs & Border Protection*, No. 10 Civ. 3793, 2012 WL 177563 (N.D. Cal. Jan. 23, 2012) (failure to search spelling variants as requested inadequate); *Habeas Corpus Resource Ctr. v. U.S. Dep't of Justice*, No. 08 Civ. 2649, 2008 WL 5111224 (N.D. Cal. Dec. 2, 2008) (declarations specifying only two or three search terms were insufficient to establish adequacy); *Schwartz*, 2017 WL 78482, at *9 (limited keyword search in response to broad request inadequate); *Nat'l*

*Immigration Project of the Nat'l Lawyers Guild v. U.S. Dep't of Homeland Sec.*, No. 11 Civ. 3235(JSR), 2012 WL 6809301, at *6 (S.D.N.Y. Dec. 27, 2012) (failure to use relevant search term rendered search inadequate).  Likewise here, the Court should order the Board to expand its search of all Board members' email records to include all relevant keywords.

### III.   The Board's Failure to Search Agency Records at the Federal Reserve Banks Was Unreasonable.

The Board's search was also inadequate because the Board unreasonably failed to search *any* agency records maintained by the Reserve Banks, even though the Board's own documents clearly indicate that the Reserve Banks are likely to have responsive documents.  *See* PSUF ¶49.

The Board must search for and disclose all responsive "agency records," including agency records located at the Reserve Banks.  *See* 5 U.S.C. § 552(a)(4)(B); *Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 158, 160 (2d Cir. 2010).  "Materials are agency records under FOIA if: (1) the agency created or obtained the relevant records, and (2) the agency is in control of the documents at the time of the FOIA request."  *Fox News Network*, 601 F.3d at 160 (citing *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144-45 (1989)).  Under the Board's own FOIA regulations, "[t]he Secretary of the Board … is the official custodian of all Board records, including records that are in the possession or control of the Board, *any Federal Reserve Bank*, or any Board or *Reserve Bank employee*."  12 C.F.R. §261.3(a) (emphasis added).  Pursuant to the Board's regulations, as interpreted by the Second Circuit, "records of the Federal Reserve Banks become records of the Board [(i)] when they are created pursuant to the 'performance of functions for or on behalf of the Board' or [(ii)] when they 'are maintained for administrative reasons in the regular course of business in official files in any division or office of the Board or any Federal Reserve Bank in connection with the transaction of any official business.'"  *Fox News*, 601 F.3d at 161 (quoting 12 C.F.R.

§261.2(*i*)(1)(i)-(ii)).  "So long as records at the [Federal Reserve Banks] satisfy the plain

language meaning of 12 C.F.R. §261.2(i)(1), they qualify as agency records of the Board and are

subject to FOIA requests."  *Bloomberg L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 649

F.Supp.2d 262, 274 (S.D.N.Y. 2009), *aff'd*, 601 F.3d 143 (2d Cir. 2010).

  The Board attempts to defend its failure to search the FRBs by asserting that the FRBs

exercise independent, rather than delegated, authority to appoint their presidents, and therefore

"records at Federal Reserve Banks regarding the presidential appointment process or assessments

of presidents' performance are not Board records."  Supp. Caperton Decl. ¶7 (emphasis omitted).

But the Second Circuit has already rejected the Board's argument that the second category of

Board records – those "maintained for administrative reasons in the regular course of business" –

is limited to records created "'under delegated authority from the Board.'"  *Fox News*, 601 F.3d

at 162 (rejecting Board's narrow interpretation of 12 C.F.R. §261.2(i)(1)(ii); "[t]he context and

phrasing of the regulation gives no support for the proposed limitation").  Rather, the Second

Circuit has explained that the second regulatory category of "Board records" broadly

encompasses all records held at the twelve FRBs "that are maintained for administrative reasons,

in the regular course of business … by any Federal Reserve Bank, and in connection with the

transaction of any official business."  *Id.*; *see also Ball v. Bd. of Governors of Fed. Reserve Sys.*,

87 F.Supp.3d 33, 44 n.1 (D.D.C. 2015) (noting that Second Circuit's interpretation "appears to

include *all* records of the FRBs regarding official business").  As records generated and

maintained in the regular course of business and in the performance of official business, records

at the FRBs regarding the presidential appointment process and assessments of presidents'

performance unquestionably qualify as agency records under 12 C.F.R. §261.2(i)(1)(ii).

In any event, such records also qualify under the first regulatory category of "Board records."  Even if the FRBs' records regarding the presidential appointment process or assessments of presidents' performance are not created "on behalf of" (*i.e.*, pursuant to delegated authority from) the Board, they are created in the "performance of functions for" the Board.  12 C.F.R. §261.2(*i*)(1)(i).  The Board's Federal Reserve Administrative Manual directs each FRB board to "evaluate its president's performance annually," and to discuss that annual assessment with the Board "during Reserve Bank evaluation meetings between the members of the Committee on Federal Reserve Bank Affairs and the Reserve Bank's chairman and deputy chairman."  PSUF ¶25; Chan Decl. Ex. 3 (CPD_FOIA 00207).  Furthermore, while 12 U.S.C. §341 (Fifth) authorizes each FRB board to appoint a president, that same statutory provision provides that such appointments are subject to "the approval of the Board of Governors," and the Board requires each FRB board to assess their president's performance in seeking the Board's approval of their presidential appointment decisions.  *See* 12 U.S.C. §341 (Fifth); PSUF ¶26; Chan Decl. Ex. 4 (CPD_FOIA 00103).  The records created and maintained by the FRBs concerning the presidential appointment process and assessments of presidents' performance therefore exist, at least in part, for the Board's use in determining whether to approve the FRB boards' presidential appointment decisions.  *See* PSUF ¶50; PRDSUF ¶45 (FRBs send material to the BAC "to provide information and advice to the Board to assist it in its decision whether or not to approve the reappointments under section 4 of the FRA").

Furthermore, the Board was also obligated to search the Reserve Banks for records responsive to Parts IV and V of CPD's FOIA Request, which sought records relating to the Board's oversight of appointments of Class A and Class B directors (Part IV) and the Board's appointment of Class C directors (Part V) of the Reserve Banks, including, *inter alia*, "[a]ll

directives, instructions, and guidelines communicated by the Board to the regional boards of directors" relating to these appointment.  FOIA Request at 23.  Even under the Board's own narrow (and erroneous) interpretation of what constitutes records maintained "for administrative reasons" at the Reserve Banks, by the Board's own admission, those records encompass documents responsive to Parts IV and V of CPD's FOIA Request.  According to a declaration of Jennifer J. Johnson, given in her capacity as Secretary of the Board, the "categories of Board records housed 'for administrative reasons' in official files at the twelve FRBs," and that therefore indisputably constitute agency records within the meaning of 12 C.F.R. §261.2(i)(1)(ii), include "records pertaining to the selection and appointment of FRB directors."  PSUF ¶51; Chan Decl. Ex. 8 (Decl. of Jennifer Johnson ("Johnson Decl.")) ¶¶1-2, 7, 9, 17 (capitalizations omitted).  As Ms. Johnson explains, "This category of Board records concerns the qualifications, eligibility, appointment, conduct in office, and suspension or removal of directors of the FRBs." PSUF ¶51; Johnson Decl. ¶17.  Accordingly, there is no basis for the Board's refusal to search the Reserve Banks for records responsive to Parts IV and V of the FOIA Request.

## CONCLUSION

"A district court that finds a search to be inadequate may direct the defendant to conduct additional searches."  *Immigrant Def. Project*, 208 F.Supp.3d at 527; *see, e.g.*, *id.* at 533 (directing agencies to carry out additional searches); *NDLON*, 877 F.Supp.2d at 112 (same); *Republican Nat'l Cmte.*, 235 F.Supp.3d at 242 (same).  For all the foregoing reasons, this Court should deny the Board of Governors' motion for summary judgment, grant Plaintiff's motion for summary judgment, and order the Board to conduct the additional searches specified in Plaintiff's Notice of Motion and Motion, and to produce all responsive documents forthwith.

Dated: February 9, 2018                                  Respectfully submitted,

*/s/ Connie K. Chan*
Connie K. Chan

Stephen P. Berzon (*pro hac vice*)
  sberzon@altber.com
Eric P. Brown (NY Bar #4737938)
  ebrown@altber.com
Connie K. Chan (*pro hac vice*)
  cchan@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064

26